UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| V. | : | Case No. |
| | : | |
| DONALD ANTHONY WRIGHT and RETIREMENT SPECIALTY GROUP, INC., | : | |
| | : | |
| Defendants. | : | |

# COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission" or "SEC"), alleges the following:

## OVERVIEW

1. Beginning in or around June 2021 through at least July 2023, Retirement Specialty Group, Inc. ("RSG"), a Tennessee-based SEC-registered investment adviser, and its principal, Cookeville, Tennessee resident Donald Anthony Wright ("Wright") (collectively, "Defendants") recommended, offered, and sold over $2.4 million in fraudulent promissory notes to at least five RSG advisory clients and at least one other person.

2. Wright raised this money, at least in part, to support his efforts to acquire a faith-based media marketing company. Specifically, several entities told

Wright that they could help him secure financing for this acquisition, but insisted that he first transfer certain amounts to them as a prerequisite. Lacking these funds himself, Wright generated the required capital by having his advisory clients and at least one other investor purchase promissory notes supposedly issued by these entities ("the Note Issuers").

3. In selling these notes, Wright made material misrepresentations and omissions concerning the nature and safety of the investments and the planned use of proceeds. For some investments, he misrepresented that he had invested his own money. In another instance, Wright recommended and sold a Note Issuer's promissory notes to two clients immediately before Wright obtained a loan from the Note Issuer. Upon information and belief, the Note Issuer required the sale of these notes as a prerequisite to loaning Wright any money.

4. Wright also failed to disclose his conflicts of interest to his clients; namely, Wright failed to disclose that he and/or RSG had business relationships with the Note Issuers to help Wright secure funds, including for the purchase of the faith-based media marketing company, generally, and that he was recommending these notes so that he could secure financing from the Note Issuers to purchase the company and to otherwise obtain money, specifically.

5. Wright also sold forged notes that purportedly were issued by one Note Issuer but, in reality, were issued by Wright without the Note Issuer's knowledge or

authorization. Wright did not disclose that these notes were unauthorized and forged, or that that he planned to use the note proceeds solely for his personal benefit in an attempt to obtain financing to purchase the media company and for other purposes.

6. After defrauding investors with the sale of these notes, Wright repeatedly misled them about the status of their investments and repayments. This included having the clients enter into further agreements with the Note Issuers and, in at least one instance, falsifying wire transfer information to mislead a client that Wright would imminently have funds available to repay the client.

## VIOLATIONS

7. Defendants have engaged in acts or practices resulting in violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1) and (2)]. Unless restrained and enjoined by this Court, Defendants will continue to engage in acts and practices that violate these provisions.

## JURISDICTION AND VENUE

8. The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v], Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)], and Sections 209(d) and 209(e) of

the Advisers Act [15 U.S.C. §§ 80b-9(b) and (d)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties, and for other equitable relief.

9. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14(a)].

10. Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

11. Venue is proper in this Court because certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act, the Exchange Act, and the Advisers Act occurred in the Middle District of Tennessee, and Defendants reside in this district.

## DEFENDANTS

12. Retirement Specialty Group, Inc. is a Tennessee corporation with its principal place of business in Cookeville, Tennessee. At all times relevant to the claims asserted in this Complaint, RSG has been a registered investment adviser. RSG has been an SEC-registered investment adviser since May 25, 2022, and

previously was registered with Tennessee and several other states. As of January 18, 2024, RSG reported approximately $26.8 million of regulatory assets under management. RSG advertises itself as a "faith-based" advisor and most of its advisory clients are Christian.

13. Donald Anthony Wright, age 54, is a resident of Cookeville, Tennessee. Wright is the President, Chief Executive Officer, and Chief Compliance Officer of RSG, which he co-owns with his wife. Wright holds a Series 65 securities license, and he previously held Series 6 and 63 licenses.

14. Wright is a former Senior Pastor of Faith in the World Church. During the relevant period, Wright regularly promoted himself and RSG's "faith-based" investment business, including through a SiriusXM talk show, podcasts, and written materials.

15. Wright used his religious affiliations to primarily target Christian clients and purported to offer a variety of financial services, including "faith-based investing."

## DEFENDANTS' OFFER AND SALE OF FRAUDULENT PROMISSORY NOTES

16. Beginning in or around 2021, Wright became interested in acquiring a Christian-based media marketing company located in Texas that represents several prominent Christian pastors and evangelists. The acquisition price exceeded $20 million.

5

17. Wright lacked the funds for this acquisition and was either unwilling or unable to obtain traditional financing.

18. In searching for possible ways to raise the necessary capital, Wright came into contact with and entered into business relationships with at least three Note Issuers that purported to assist their customers with securing financing for specific projects.

19. Each of the Note Issuers indicated that they could help Wright obtain funds – sometimes hundreds of millions of dollars – which Wright could use to purchase the media marketing company and for other purposes.

20. One of the Note Issuers agreed to loan Wright approximately $500,000, but, on information and belief, would do so only if Wright first sold $1 million of the Note Issuer's promissory notes to investors so that the note proceeds could serve as collateral for the loan to Wright.

21. The other two Note Issuers told Wright that, to access financing to purchase the media company, Wright would first need to provide them with a certain amount of capital.

22. To satisfy the requirements of the Note Issuers, Wright began raising money from his advisory clients and at least one other investor, recommending that they invest in promissory notes issued by (or purportedly issued by) the Note Issuers.

23. The promissory notes that Wright recommended, offered, and sold had varying maturities and interest rates. For example, some notes had a one-year maturity, with principal and 6% annual interest due at maturity. Other notes had maturities as short as one month, with principal, monthly interest of up to 20%, and additional lump-sum payments due at maturity.

24. In some instances, Wright sold forged promissory notes. Specifically, Wright used form promissory notes of one Note Issuer to make it appear that the Note Issuer was issuing the promissory notes. In fact, however, the promissory notes did not come from and were not authorized by the Note Issuer, and Wright used the proceeds for his own purposes.

25. Of the $2.42 million in promissory notes sold by Wright, approximately $950,000 consisted of three forged notes sold to two RSG clients and one other investor.

## Wright's Misrepresentations and Omissions to Investors

26. Wright told several potential promissory note investors that the Note Issuers were reputable.

27. Regarding at least one Note Issuer, however, the photos of the "Management Team" shown on that Note Issuer's website consisted mainly of stock internet images, not employees of that issuer.

28. In another instance, a Note Issuer's note claimed on its face that the company was a "Morgan Stanley financial fund."

29. Wright personally repeated the claim that the Note Issuer had a relationship with Morgan Stanley in correspondence with at least one investor whose note Wright claimed was issued by the Note Issuer.

30. In fact, however, the Note Issuer had no affiliation with Morgan Stanley other than as an ordinary customer.

31. In nearly all known instances, the notes stated on their face that they were secured, including by, for example, a "Multi-Family Commercial Real Estate Investment Portfolio," or a "Bank Issued Cash Backed Stand By Letter of Credit."

32. However, Wright never received any security agreement executed by any of the Note Issuers and, upon information and belief, no such security agreements or collateral existed.

33. Some of the promissory notes that Wright fabricated also represented that the notes were fully secured. Given that Wright had fabricated the notes, he knew that the representations regarding security agreements in those notes were also false.

34. Wright also told some potential investors that the notes were safer and more stable than the stock market.

35. In many instances, Wright knew these statements were false. For example, Wright knew that he we would send a substantial amount of investment proceeds to overseas bank accounts in exchange for promises that Wright would quickly receive hundreds of millions of dollars in financing to purchase the faith-based media marketing company.

36. Wright never disclosed the actual risk of the promissory notes.

37. In some instances, Wright told potential investors that Wright himself had invested substantial funds.

38. In fact, Wright had invested no personal funds.

39. In selling the promissory notes, Wright did not disclose his conflicts of interest to his advisory clients, including that he had business and financial relationships with the Note Issuers and was recommending and selling these notes so that the Note Issuers could assist him with obtaining financing, including financing to acquire the media marketing company.

## Wright's Fraudulent Use of Investor Proceeds

40. In at least one instance, Wright obtained a personal loan from a Note Issuer by first convincing two clients to invest in promissory notes issued by the Note Issuer.

41. Wright accomplished this by transferring client funds to a Note Issuer as payment for notes and, the following day, obtaining a loan from the Note Issuer. A

substantial amount of the loan was funded with proceeds from the note sales, and the Note Issuer used the remaining note proceeds for various purposes.

42. Wright never disclosed this conflict of interest to the client, *i.e.,* that Wright was recommending the note so that he could borrow money from the Note Issuer.

43. An agent of a Note Issuer eventually returned $220,000 of another client's investment funds to RSG.

44. RSG and Wright did not return any of those funds to the investor and, instead, deposited them into an RSG business account, where they were comingled with other funds and used to pay general business and personal expenses.

45. Wright also misappropriated the forged note proceeds, using them for his personal benefit.

46. Specifically, Wright directed most of the approximately $950,000 in forged note proceeds to be transferred from the investors' accounts to accounts owned and controlled by RSG and/or Wright, and directed the remaining proceeds to be sent from the investors' accounts to foreign accounts controlled by individuals and entities who appear to have offered to assist Wright in obtaining financing.

47. Of the investor money from the forged note transactions transferred to accounts controlled by RSG and/or Wright, Wright: (i) sent $250,000 to the media

marketing company in connection with his planned purchase of the company; (ii) sent at least $360,000 to foreign accounts in hopes of obtaining financing; and (iii) comingled the remaining money with other money in RSG's business account.

## WRIGHT'S CONTINUED FRAUD AFTER SELLING THE NOTES

48. Upon information and belief, all of the notes that have become due are in default. None of the investors have received any of their principal or interest.

49. Once the notes started to default, Wright sought to placate clients by providing them with updates about the status of their investments. This included repeated representations by Wright that payment was imminent and convoluted explanations for why clients had not received their promised returns.

50. Wright told some clients that "the money is tied up in England" and "governments need to make sure that the money is clean and no terrorists are involved."

51. Wright also blamed the SEC investigation for non-payment, telling at least one client that RSG was holding back payment until the conclusion of the investigation.

52. Wright also convinced each investor, including those whose notes had not yet come due, to execute a "Release of Liability/Waiver Agreement" with the Note Issuers.

53. While some of these releases were to be effective upon final payment, in others the investors expressly acknowledged receipt of final payment even though they had not received the repayment of principal or any interest.

54. Wright told investors that these releases were one of the final hurdles to them receiving payment and created the impression that they needed to sign immediately in order to get their money back.

55. In September 2023, Wright sent at least one client an email in which he claimed that RSG was about to receive an $8.1 million wire transfer from which Wright could repay the client, and he attached a wire transfer confirmation to support his claim.

56. In reality, the wire transfer confirmation was fake, having been altered by Wright. RSG never received the $8.1 million.

## COUNT I – FRAUD

**Violations of Section 17(a)(1) of the Securities Act
[15 U.S.C. § 77q(a)(1)]**

57. Paragraphs 1 through 56 are hereby realleged and incorporated herein by reference.

58. Between June 2021 and at least July 2023, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails,

directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities; all as more particularly described above.

59. Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

60. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II – FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

61. Paragraphs 1 through 56 are hereby realleged and incorporated herein by reference.

62. Between June 2021 and at least July 2023, Defendants, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

　　a. obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.  engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

63. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act and Sections (a), (b), and (c) of Rule 10b-5 Thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 (a), (b), and (c)]**

64. Paragraphs 1 through 56 are hereby realleged and incorporated herein by reference.

65. Between June 2021 and at least July 2023, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

a.  employed devices, schemes, and artifices to defraud;

b.  made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

66. Defendants, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.

67. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Sections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## COUNT IV – FRAUD

### Violations of Sections 206(1) of the Advisers Act
### [15 U.S.C. § 80b-6(1)]

68. Paragraphs 1 through 56 are hereby realleged and incorporated herein by reference.

69. From June 2021 through at least July 2021, while acting as investment advisers, Defendants used the mails and the means and instrumentalities of interstate commerce, directly and indirectly, employed devices, schemes and artifices to defraud one or more advisory clients and/or prospective clients.

70. Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

71. By reason of the foregoing, Defendants, directly and indirectly, have violated, and, unless enjoined, will continue to violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT V – FRAUD

### Violations of Section 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(2)]

72. Paragraphs 1 through 56 are hereby realleged and incorporated herein by reference.

73. From June 2021 through at least July 2023, Defendants, while acting as investment advisers, by the use of the mails and the means and instrumentalities of interstate commerce, directly and indirectly, engaged in transactions, practices, and courses of business which would and did operate as a fraud and deceit on one or more advisory clients and/or prospective clients.

74. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

**I.**

Findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendants committed the violations alleged;

**II.**

An Order permanently restraining and enjoining each Defendant, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1) and (2)];

**III.**

An Order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and its inherent equitable powers, enjoining Wright from acting as an officer or director of an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

**IV.**

An Order permanently restraining and enjoining Defendant Wright from directly or indirectly, including, but not limited to, through any entity controlled by

him, participating in the issuance, purchase, offer, or sale of any security, provided, however: (1) such injunction shall not prevent Wright from purchasing or selling securities listed on a national securities exchange for his own personal account, nor prevent Wright from purchasing or holding equity securities issued by privately held companies for his own personal account; and (2) further provided that he may sell any such equity securities if, and only if, the sale either constitutes a complete divestment of Wright's interest in a privately held company or occurs in direct conjunction with a change in control in a privately held company in which Wright holds an equity interest.

## V.

An Order requiring Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

## VI.

An Order requiring Defendants to pay a civil penalty pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 209(e) of the Advisers Act [ 15 U.S.C. § 80b-9(e)]; and

## VII.

Granting such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

This 9th day of September, 2024.

Respectfully submitted,

*/s/ M. Graham Loomis*
M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

W. Shawn Murnahan
Senior Trial Counsel
Georgia Bar No. 529940
murnahanw@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 842-7600
Facsimile: (404) 842-7679